**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MARITA EIBL, *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil No. 25-cv-00004 (APM)** |
| **DISTRICT OF COLUMBIA,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Plaintiffs Marita Eibl and her minor son, F.L., bring this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* They seek review of a hearing officer's ruling that Defendant District of Columbia did not deny F.L. a free appropriate public education during the 2022-2023, 2023-2024, and 2024-2025 school years. Specifically, Plaintiffs contend that the hearing officer erred in concluding that Defendant (1) provided F.L. with an appropriate placement in his least restrictive environment during the three school years, (2) was not required to support F.L. with appropriate supplementary aids and services, and (3) did not deny F.L.'s parents' request to observe his proposed placement for the 2024-2025 school year. *See* Admin. Rec., ECF No. 7 [hereinafter A.R.], at 14–19.[1]

Before the court are the parties' cross-motions for summary judgment. *See* Pls.' Mot. and Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J., ECF No. 8 [hereinafter Pls.' Mem.]; Def.'s Cross-Mot. Summ. J., ECF No. 14. After considering the briefing and the full record, the court

[1] All page citations are to the original pagination of the Administrative Record.

affirms the hearing officer's decisions and accordingly denies Plaintiffs' Motion for Summary Judgment and grants Defendant's Cross-Motion for Summary Judgment.

## II. BACKGROUND

### A. Statutory Background

The IDEA mandates that states, including the District of Columbia, receiving federal educational assistance establish "policies and procedures to ensure," among other things, that a "free appropriate public education," or FAPE, is available to all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). "To guarantee that no child with a disability misses out on the education the Act promises, and to ensure, in turn, that the education offered is 'appropriate,' [the] IDEA requires that school officials develop a comprehensive strategy, known as an 'individualized education program,' or IEP, tailored to the student's unique needs." *Leggett v. Dist. of Columbia*, 793 F.3d 59, 63 (D.C. Cir. 2015) (quoting 20 U.S.C. § 1414(d)(1)(A)). The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE–1*, 580 U.S. 386, 399 (2017). This "fact-intensive exercise" is "informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id.*

At the same time, the IDEA requires that, "to the maximum extent appropriate," public schools provide covered students an education in the "[l]east restrictive environment" possible. 20 U.S.C. § 1412(a)(5)(A). States must ensure that the "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*; *see also Endrew F.*, 580 U.S. at 400 (recognizing that "the

IDEA requires that children with disabilities receive education in the regular classroom whenever possible").

**B. Factual Background**

*1. F.L.'s History*

All who know F.L. describe him as a "wonderful child at home and at school." A.R. 5. At the time of the administrative hearing, he was five years old. *Id.* at 21. He is diagnosed with Down syndrome and childhood apraxia of speech, rendering him eligible for special education and related services as a student with a developmental delay. *Id.* at 8, 21, 31. As a result of his childhood apraxia of speech, F.L. "presents as mostly nonverbal" and communicates through "various methods," including a speech-generating device, sign language, gesturing, and some verbal output. *Id.* at 31, 970. But F.L. comprehends more than he can readily communicate. *Id.* at 822. As an evaluator who assessed F.L. in August 2024, *id.* at 819, summarized, F.L. is a "little boy [who] understands a tremendous amount but is quite severely limited by his inability to communicate verbally," *id.* at 821.

During the 2022-2023 school year, F.L. was placed in a self-contained communication education support ("CES") program at Langdon Elementary School. *Id.* at 8, 21. His initial IEP, developed on May 27, 2022 (2022 IEP), provided for 2.50 hours per week of specialized instruction inside general education and 19.75 hours per week of specialized instruction outside general education, along with 180 minutes per month of physical therapy ("PT"), 240 minutes per month of occupational therapy ("OT"), and 240 minutes per month of speech-language pathology ("SLP"), all outside general education. *See id.* at 293–311. It did not include a dedicated aide. *Id.*

The following year, F.L. was moved to a self-contained CES program at Takoma Elementary School. *Id.* at 8, 21. His new IEP, developed May 19, 2023 (2023 IEP), provided for

0.50 hours per week of specialized instruction inside general education and 25 hours per week of specialized instruction outside general education, along with 60 minutes per month of PT, 240 minutes per month of OT, 180 minutes per month of SLP in a small group, and 60 minutes per month of SLP individually, all outside general education. *Id.* at 273–92. This IEP, too, did not provide for a dedicated aide. *Id.*

F.L.'s next IEP, developed on May 22, 2024 (2024 IEP), provided for 3.75 hours per week of specialized instruction inside general education and 21.75 hours per week outside general education, along with 90 minutes per month of PT, 240 minutes per month of OT, 180 minutes per month of SLP in a group, 60 minutes per month of SLP individually, all outside general education. *Id.* at 236–72. This IEP, like those before it, provided no dedicated aide. *Id.* The IEP's least restrictive environment section stated that F.L. was not demonstrating independence in a general education setting and required "maximum adult support." *Id.* at 267.

The 2024 IEP team also discussed F.L.'s placement for the upcoming school year. School authorities proposed moving him to a self-contained early learning support ("ELS") classroom. *Id.* at 8, 12, 21. They advised that the CES program, which generally serves students with autism and related disorders, was no longer appropriate for F.L. and that an ELS program, which generally serves children with developmental delays and follows the general education curriculum, was a better fit and could help F.L. build the skills he needed to transition into general education. *Id.* at 10–11, 797, 871. F.L.'s parents opposed the recommendation. They requested that F.L. be placed in a general education setting with a dedicated aide, a placement initially recommended by F.L.'s clinical geneticist. *Id.* at 13, 871–73. F.L.'s parents also opposed an ELS classroom because Takoma Elementary did not support such a classroom, and they wanted to preserve continuity with

F.L.'s therapists and avoid F.L. having to attend a third school in three years. *Id.* at 867. They also had not observed an ELS classroom. *Id.*

Ultimately, Defendant decided against placing F.L. in general education with a dedicated aide and proposed a placement in an ELS classroom at LaSalle-Backus Elementary School. *Id.* at 21, 875–76. His parents requested an opportunity to observe the ELS placement under D.C. Code § 38-2571.03(5)(A). *Id.* at 432, 878. After attempting to schedule a visit, a school representative informed them that it was "the last week of school and [they would not] be able to observe." *Id.* at 878. School authorities later said that the "observation could have occurred" when the school reopened for the school year but, by that time, the parents had rejected the placement and had initiated these proceedings. *Id.* at 1168.

*2. Administrative Proceedings*

That summer, F.L.'s parents filed a due process complaint and requested a due process hearing "to remedy [Defendant's] failure to provide [F.L.] with an appropriate placement in the least restrictive environment." *Id.* at 26–28, 30. A hearing officer held an evidentiary hearing to determine whether Defendant denied F.L. a FAPE by: (1) failing to place him in the least restrictive environment during the 2024-2025 school year when nearly 70 percent of his school day was in a self-contained ELS classroom; (2) denying his parents' request to observe the ELS program after Defendant proposed it for the 2024-2025 school year; (3) failing to provide F.L. a placement in his least restrictive environment during the 2022-2023 and 2023-2024 schools years when most of his day was in a self-contained CES classroom; and (4) failing to provide F.L. supplementary aides and services in a general education classroom, including a dedicated aide, during all three years. *Id.* at 780–84.

At the hearing, Plaintiffs presented four witnesses: F.L.'s parents, F.L.'s neurodevelopmental assessor, and F.L.'s grandmother, who also was designated as an expert in special education, including IEP development and teaching students with cognitive disabilities. *Id.* at 21. Plaintiffs' experts emphasized that F.L. is "imitative" and "thrives on interactions and play" with neurotypical peers and could benefit from placement in a general education setting where he could watch children "speaking appropriately" and therefore "absorb" and "practice" normal speech. *Id.* at 824–25; *see also id.* at 900 (describing F.L.'s capacity for imitative and "incidental learning"). They also testified to the positive effects of a general education placement on students with disabilities like F.L.'s and the negative effects of being in a segregated setting. *Id.* at 826–27, 903–05. F.L.'s parents likewise testified that F.L.'s doctor informed them that a general education placement would benefit F.L., since it would give him "the opportunity to mimic behaviors of other children" and to "be able to learn from other speakers and see how they are conversing with each other." *Id.* at 875. His parents also expressed concern that, by being segregated from his neurotypical peers for most of the school day, F.L. would miss "the opportunity to absorb good behaviors." *Id.* at 885; *see also id.* at 935 (expressing concern that F.L. would see "that he is both kept apart and growing apart" from other kids).

Defendant presented five witnesses: F.L.'s CES teacher at Takoma, a speech language pathologist, F.L.'s special education teacher at Langdon, a board-certified behavior analyst, and a local education agency representative. *Id.* at 21–22. F.L.'s teachers identified his strengths, but also areas for growth. *See generally id.* at 971, 1047–49. F.L., for example, "engaged in a lot of noncompliant behavior." *Id.* at 971. He excelled at tasks he wanted to do, but would drop to the floor, refuse, or escape non-preferred activities. *Id.* at 971, 973. He often refused to join his peers in the general education classroom and was only able to engage in whole group instruction for a

few minutes out of a time block. *Id.* at 975, 987, 1049. He also struggled with independent toileting. *Id.* at 981, 1057. The teachers opined that, even if assigned a dedicated aide, F.L. "would not be able to access the [general education] curriculum in the same way that he would be able to get his needs met in an ELS classroom." *Id.* at 987, 1054–55. Defendant's other witnesses also opined that, for various reasons, an ELS classroom was an appropriate placement for F.L., and that a general education setting likely would be "overwhelming" for him. *Id.* at 1024, 1026, 1085, 1108. They also believed that he would "learn more functional independence" in a small classroom setting than in general education with a dedicated aide on whom he likely would become dependent. *Id.* at 1085–86.

Following the hearing, the hearing officer concluded that, "[o]n balance . . . it would be better for [F.L.] to begin in a self-contained ELS classroom and grow into general education, rather than beginning with too challenging a situation in general education and constantly be struggling and unable to keep up with peers." *Id.* at 16. The hearing officer therefore found that Defendant did not deny F.L. a FAPE during the 2022-23, 2023-24, and 2024-25 school years. *Id.* at 16–19. Plaintiffs then brought this action. *See* Compl., ECF No. 1.

## III. LEGAL STANDARD

The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to "bring a civil action" in a federal district court. 20 U.S.C. § 1415(i)(2). The reviewing court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C). When, as here, neither party presents additional evidence, a motion for summary judgment operates

as a motion for judgment based on the administrative record. *See J.B. by & through Belt v. Dist. of Columbia*, 325 F. Supp. 3d 1, 5 (D.D.C. 2018).

Reviewing courts must give "due weight" to a hearing officer's determinations. *See Z.B. v. Dist. of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018) (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)). And they may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. At the same time, in the IDEA context, the court "afford[s] less deference than is conventional in administrative proceedings, especially when the decision is insufficiently supported by fact or reasoning." *Z.B.*, 888 F.3d at 523 (internal quotation marks omitted); *see also Kerkam v. Superintendent, Dist. of Columbia Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) (stating that a decision "without reasoned and specific findings deserves little deference") (internal quotation marks omitted). The party challenging the hearing officer's ruling "take[s] on the burden of persuading the court that the hearing officer was wrong." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989).

Importantly, the Supreme Court has observed that "deference" to school authorities is "based on the[ir] application of expertise and the exercise of judgment." *Endrew F.*, 580 U.S. at 404. "A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable a child to make progress appropriate in light of his circumstances." *Id.*

## IV. DISCUSSION

### A. Least Restrictive Environment

The primary issue before the court is whether the hearing officer erred in concluding that Defendant failed to educate F.L. in his least restrictive environment, namely, a general education

classroom with the support of an aide. Plaintiffs present the issue in three ways. Pls.' Mem. at 12. First, Plaintiffs contend that, by placing F.L. in a self-contained ELS classroom, Defendant failed to educate him in his least restrictive environment during the 2024-2025 school year. *Id.* at 2. Second, they argue that, by placing F.L. in a self-contained CES classroom, Defendant failed to educate him in his least restrictive environment during the 2022-2023 and 2023-2024 school years. *Id.* Finally, Plaintiffs assert that Defendant failed to provide F.L. with the appropriate supplementary aids and services he needed in the general education setting during all three years, particularly in the form of a designated aide. *Id.*

Plaintiffs now present placing F.L. in a general education setting with a dedicated aide as an "all or nothing" proposition. That was not, however, the precise question before the hearing officer. At the administrative hearing, Plaintiffs proposed a general education classroom placement with a full-time dedicated aide along with several hours of specialized services, including two hours per day of special education, three to five hours per week of speech therapy, an hour per week of OT, and an hour per week of PT. A.R. at 829. At the same time, Defendant's position was not that F.L. receive no exposure to a general education environment. Rather, the 2024 IEP provided for several hours of weekly instruction inside the general education setting. *Id.* at 225. For this reason, the hearing officer observed that, "[w]hile the parties . . . emphasize the differences in their positions, in fact these differences [were] less than they seem[ed] on the central issue of whether a self-contained program of general education with significant supports would most benefit [F.L.]" *Id.* at 15. Thus, the question for the hearing officer was whether the 2024 IEP as a whole satisfied the IDEA's least-restrictive setting requirement.

The "command to 'mainstream' disabled students," or place them in regular classrooms to the maximum extent possible, "is a central feature of the IDEA's design." *Pierre-Noel on behalf*

*of K.N. v. Bridges Pub. Charter Sch.*, 113 F.4th 970, 982 (D.C. Cir. 2024); *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 522–23 (D.C. Cir. 2019) (identifying integration as "[o]ne of the statute's key goals"). This mainstreaming requirement sits in some tension with the requirement that the IEP be designed according to a child's unique needs and circumstances. After all, the "IEP must aim to enable the child to make progress," *Endrew F.*, 580 U.S. at 399, and, in certain circumstances, mainstreaming may not facilitate a child doing so, *Schoenbach v. Dist. of Columbia*, No. 05-cv-1591 (RMC), 2006 WL 1663426, at *7 (D.D.C. June 12, 2006) (observing that "mainstreaming is not proper for every disabled child"). Accordingly, while placement decisions must take the IDEA's least restrictive environment provisions into account, federal and D.C. regulations still "require placements to be 'based on the child's IEP.'" *Roark ex rel. Roark v. Dist. of Columbia*, 460 F. Supp. 2d 32, 43 (D.D.C. 2006) (citing 34 C.F.R. § 300.552 and D.C. Mun. Regs. tit. 5, § 2013 (2006)).

The D.C. Circuit appears not to have addressed the proper standard for reviewing a least restrictive environment challenge. Other circuits have. They have adopted varying but generally overlapping tests for determining compliance with the IDEA's mainstreaming requirement. *See N.T. v. Galesburg Cmty. Unit Sch. Dist. No. 205*, 174 F.4th 1044, 1057 n.3 (7th Cir. 2026) (collecting cases). Most circuits have adopted a two-step test first articulated by the Fifth Circuit in *Daniel R.R. v. State Board of Education*, 874 F.2d 1036 (5th Cir. 1989). They ask: (1) whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily for a given child; and, if not, (2) whether the school's placement mainstreams the child to the maximum extent appropriate. *Id.* at 1048; *see also P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119–20 (2d Cir. 2008); *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1215 (3d Cir. 1993); *L.B. ex rel. K.B.*

*v. Nebo Sch. Dist.*, 379 F.3d 966, 976–77 (10th Cir. 2004); *C.B. by & through K.B. v. Henry Cnty. Sch. Dist.*, 167 F.4th 1134, 1141 (11th Cir. 2026). *Daniel R.R.* also offers a list of noncomprehensive factors for courts to consider at the first step, including the school district's efforts to accommodate the child, the benefits to the child, and the effects of inclusion on other children in the classroom. 874 F.2d at 1048–49; *see also Oberti*, 995 F.2d at 1217–18. The Seventh and First Circuits have adopted a variation of this two-step framework that sets aside these additional factors and asks simply whether the school district has mainstreamed the child to the maximum extent appropriate. *See Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002); *C.D. by & through M.D. v. Natick Pub. Sch. Dist.*, 924 F.3d 621, 630 (1st Cir. 2019). The Sixth, Fourth, and Eighth Circuits have adopted a test focused on the feasibility of mainstreaming the child. *See Roncker On Behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983); *DeVries by DeBlaay v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878–79 (4th Cir. 1989); *A.W. by & Through N.W. v. Nw. R–1 Sch. Dist.*, 813 F.2d 158, 163–64 (8th Cir. 1987). Meanwhile, the Ninth Circuit has adopted a four-factor balancing test that combines elements of both. *See Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. By & Through Holland*, 14 F.3d 1398, 1404 (9th Cir. 1994).

Without guidance from the D.C. Circuit, this court endorses no formal test. But since *Daniel R.R.*'s two-step framework "tracks the language of the IDEA's least restrictive environment requirement," *Nebo Sch. Dist.*, 379 F.3d at 977, and offers useful clarifying factors, the court finds it instructive to guide the analysis here.

*1. Adequacy of the ELS Placement*

The court begins by asking whether the hearing officer erred when it decided that Defendant correctly determined that education in a regular classroom could not be achieved satisfactorily for F.L during the 2024-2025 school year, even with the use of supplementary aids and services.

*See Daniel R.R.*, 874 F.2d at 1048. Giving due weight to the hearing officer's assessment, the court concludes that his determination that F.L.'s education could not be satisfactorily achieved in a regular classroom is well-supported by the record evidence and clearly explained.

To summarize, the hearing officer "weigh[ed] heavily the strong views of [F.L.'s family]." A.R. at 16. Indeed, he admitted that he "was convinced at the end of the first hearing day," after the presentation of Plaintiffs' witnesses, that Plaintiffs had established a *prima facie* case. *Id.* But he concluded that Defendant had "offered highly credible witnesses" on the second hearing day who explained that F.L. was "not yet ready for general education and that the ELS program [was] [F.L.'s] [least restrictive environment]." *Id.* The hearing officer pointed, in particular, to F.L.'s noncompliance and increasing behavioral challenges; his substandard communication skills, which were not "in the zone of proximity" necessary for the general education curriculum to be accessible to him; and his lack of toileting independence. *Id.* at 17. Based on these factors, the hearing officer determined that, "[d]espite significant efforts by teachers and paraprofessionals (who were much more qualified than dedicated aides), the pacing of the general education classroom was simply too much for [F.L.]." *Id.* The ELS program, by contrast, was "specifically intended for children of [F.L.'s] disability classification" and offered "a range of related services just as [F.L.] need[ed]." *Id.*

The hearing officer also considered whether a dedicated aide could address F.L.'s needs in a general education classroom. *Id.* at 16. In the end, he concluded that a dedicated aide could not bridge the gap because an aide—who is not a trained educator—would not have helped "provide [F.L.] access to the curriculum." *Id.* Crediting the testimony of Defendant's witnesses, the hearing officer also noted that aides can become an "unintended barrier" between the student and the student's teachers and peers. *Id.*

The court's review of the record evidence confirms the hearing officer's findings. Here, "the school was aware of many facts that made a general-education setting seem inappropriate" for F.L. and the school "explained" those facts in the 2024 IEP. *See Robles v. Dist. of Columbia*, No. 21-cv-02568 (CJN), 2022 WL 3700947, at *9 (D.D.C. Aug. 26, 2022); A.R. at 267. The testimony of Defendant's witnesses shows that the school team thoroughly assessed F.L.'s needs and challenges before determining that it was appropriate to move him primarily to an ELS classroom, rather than a general education setting. *See, e.g.*, A.R. at 986–87 (F.L.'s pre-K CES teacher opining that F.L. "would not be able to access the gen ed curriculum in the same way that he would be able to get his needs met in an ELS classroom"), 1024 (speech pathologist opining that "in the general education environment" F.L.'s "peer models will not be within his own proximal development. . . [and] will be as unreachable as a lot of adult speech is"), 1085–86 (special education expert opining that it would not have been "helpful for him to be in a general ed classroom even with the dedicated aide"; stating that academically and functionally F.L. "still requires substantial support to complete tasks" and "he would have more success in a smaller class size with a classroom teacher and aides to support him . . . [t]o increase his functional independence and . . . communicate with his device"), 1100–02 (Takoma educator who accompanied F.L. to general education classrooms observing that F.L. had behavioral difficulties in that setting and that, even with his presence, "it's very difficult to keep up the pace of the other students"). The hearing officer found these witnesses to be "highly credible," *id.* at 16, and the court gives "particular deference" to a hearing officer's findings "based on credibility determinations of live witness testimony," *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76–77 (D.D.C. 2014).

Plaintiffs fault the hearing officer and Defendant for not crediting the testimony of Plaintiffs' experts' views that a general education classroom was the least restrictive environment

because F.L. is "an imitative learner who would respond well to the examples of typically developing peers." Pls.' Mem. of P. & A. in Opp'n to Def.'s Cross-Mot. for Summ. J. and in Reply to Def.'s Opp'n to Pls.' Mot. Summ. J., ECF No. 16 [hereinafter Pls.' Reply], at 3. But the hearing officer did no such thing. He considered Plaintiffs' experts' testimonies and "weigh[ed] heavily the strong views of [F.L.'s] family." *See* A.R. at 16. Indeed, the hearing officer admitted that he was persuaded by them *before* he heard from any defense witness. *Id.* But, as he explained, Defendant's "highly credible witnesses" swayed him in the other direction. *Id.* Plaintiffs' objections here are fundamentally "about how the [h]earing [o]fficer weighed the evidence." *See Garris v. Dist. of Columbia*, 210 F. Supp. 3d 187, 190 (D.D.C. 2016). "That Plaintiffs draw a different conclusion from that evidence does not make the [h]earing [o]fficer's alternative conclusion improper." *Id.*

To further support their position, Plaintiffs recite the benefits of mainstreaming for children with Down syndrome and point to cases where courts have found mainstreaming to be appropriate. *See* Pls.' Mem. at 14–17. While the court does not doubt the benefits of mainstreaming children with Down syndrome, that is not the proper question. The court's task is to conduct an "individualized, fact-specific inquiry that requires [it] to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the school's response to the child's needs." *Daniel R.R.*, 874 F.2d at 1048; *Endrew F.*, 580 U.S. at 404 (observing that the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created"). For F.L., this individualized inquiry points in the opposite direction from those cases on which Plaintiffs rely. F.L., like other children with Down syndrome, may well be an imitative learner who would benefit from watching other students. But his teachers testified that, when placed in a general education setting, he spent most of his time alone and sometimes refused to join his peers.

*See generally* A.R. at 975–76, 987. And, while F.L. was social and "interest[ed] in other students," his interactions with them were not always "fully functional because he didn't want to use his device to communicate with them or sign" and "just wanted to play." *Id.* at 1049. The court cannot fault the hearing officer's weighing of the evidence.

In sum, "[t]he IDEA's mainstreaming provision establishes a presumption, not an inflexible federal mandate." *Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997). And "deference" is appropriate when school authorities apply "expertise" and "exercise . . . judgment" particular to the student. *Endrew F.*, 580 U.S. at 404. That is what occurred here. F.L.'s school team, consisting of educators who regularly observed him, decided that an ELS classroom "would better meet [F.L.'s] needs in a more structured environment" and "permit[] [F.L.] to build skills to prepare for general education." A.R. at 16, 18. They also considered whether a dedicated aide in a general education setting could provide the necessary supports and concluded that F.L. would not sufficiently benefit from one. *Id.* at 10, 19. School authorities thus offered "cogent and responsive explanation[s] for their decisions." *Endrew F.*, 580 U.S. at 404. Plaintiffs fail to carry their burden to show otherwise.

*2. Adequacy of the CES Placements*

For similar reasons that justified the suitability of F.L.'s ELS placement, the hearing officer concluded that the CES placements for the 2022-2023 and 2023-2024 school years were appropriate. A.R. at 19. Indeed, the hearing officer observed that "[b]ased on [F.L's] needs, there [was] much more of a gap between CES and general education in 2022/23 and 2023/24 than between ELS and general education in 2024/25." *Id.* The hearing officer also credited F.L.'s teachers' testimony that the CES program "was working" for F.L. and his communication skills

had improved as a result. *Id.* Accordingly, it was "even clearer" that the CES classroom was F.L.'s least restrictive environment during those school years. *Id.*

Again, the court agrees. The hearing officer's conclusions are rooted in and supported by the record evidence. *See, e.g.*, A.R. at 1054–55 (F.L.'s CES teacher testifying that F.L. showed growth in the CES classroom and opining that a general education classroom with an aide would not have allowed him to "gain access to the curriculum" in those years). Plaintiffs make the same arguments against the CES placements as they do the ELS placement*, see* Pls.' Mem. at 12–23, and for the same reasons elaborated above, the court again concludes that Plaintiffs have failed to carry their burden.

*3. Provision of a Dedicated Aide*

Plaintiffs also argue that F.L. would have been able to access the general education curriculum if Defendant had provided a dedicated aide. Pls.' Mem. at 23. But, as explained above, the hearing officer considered whether a dedicated aide would allow F.L. to access the general education curriculum, but he found more persuasive F.L.'s teachers' views that an aide would be insufficient. A.R. at 16.

Plaintiffs emphasize their experts' testimony on the potential benefits of providing F.L. with a dedicate aide. *See* Pls.' Reply at 10. Again, those objections are "about how the [h]earing [o]fficer weighed the evidence." *Garris*, 210 F. Supp. 3d at 190. Since Plaintiffs' arguments on this issue are limited to refuting the testimony of Defendant's witnesses with their own, the court accords deference to the hearing officer's weighing of the evidence. *McAllister*, 45 F. Supp. 3d at 76–77. The court also believes that deference is appropriate to school officials who knew F.L. well and applied their expertise and judgment in determining that a dedicated aide would not have

helped F.L. achieve education in a regular classroom at that time. *See Endrew F.*, 580 U.S. at 404. Accordingly, Plaintiffs fail to carry their burden on this issue as well.

**B. Opportunity to Observe the Proposed Placement**

Finally, Plaintiffs argue that Defendant denied F.L. a FAPE by refusing his parents the opportunity to observe his placement. Pls.' Mem. at 28–32. States may afford additional procedural and substantive protections under the IDEA, and individuals may bring an action under the IDEA to enforce those state standards. *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 147–48 (D.D.C. 2018). One such procedural safeguard in the District of Columbia is the right of a parent or his or her designee to observe the student's current or proposed educational placement. *See* D.C. Code § 38-2571.03(5)(A). A procedural violation, however, is only "actionable" under the IDEA when it "affect[s] the student's substantive rights." *Leggett*, 793 F.3d at 67.

The hearing officer concluded that F.L.'s parents "were never denied an opportunity to observe [F.L.'s] proposed educational setting for 2024/25 once it was identified." A.R. at 18. Plaintiffs argue that this finding was erroneous. Pls.' Mem. at 30. They point, in particular, to an email that F.L.'s parents received identifying LaSalle-Backus as the proposed placement prior to denial of the request. *Id.* (citing A.R. at 431). Upon reviewing the record, it does appear that F.L.'s parents' request to observe an ELS classroom was made after the placement had been proposed, even if informally. *See* A.R. at 431–32; Pls.' Mem. at 30. Therefore, insofar as the hearing officer implied that identification of the program occurred after the request, he was mistaken. *Id.* at 18. And, even if the program had not been formally selected, F.L.'s parents had a right to observe the "proposed" placement. *See* D.C. Code § 38-2571.03(5)(A).

Nonetheless, the record supports the hearing officer's conclusion that F.L.'s parents were not denied an opportunity to observe the ELS program. It appears that there was an attempt to

schedule a meeting, A.R. at 431, but the end of the school year arrived before the visit could be scheduled, *id.* at 878. F.L.'s parents then did not seek a visit when the new school year began, given their objection to the program. *Id.* at 1167–68. While D.C. Code § 38-2571.03(5)(A) requires "timely access" to observe, it does not require a school to reopen to permit that access to occur, and school authorities testified that "observation could have occurred" when school reopened in the fall. *Id.* at 1168. Accordingly, the record evidence does not reflect a denial of the opportunity to visit, nor a refusal that impeded F.L.'s parents' opportunity to participate in the decision-making process regarding their son's placement. *Cf. Middleton*, 312 F. Supp. 3d at 148; *see also Z.J. v. Dist. of Columbia*, No. 23-cv-1279 (JMC), 2026 WL 555016, at *7 (D.D.C. Feb. 27, 2026) (finding no denial of a FAPE, in part, because the plaintiffs "failed to link the alleged denials of their observation requests to any substantive harm they suffered in their participation in the IEP development processes"). The court therefore is not persuaded that the hearing officer erred in concluding that F.L.'s parents were not denied an opportunity to observe the placement and that any denial of their observation requests did not affect F.L.'s substantive rights.

## V. CONCLUSION

For the foregoing reasons, the court affirms the hearing officer's decision. It therefore denies Plaintiffs' Motion for Summary Judgment, ECF No. 8, and grants Defendant's Cross-Motion for Summary Judgment, ECF No. 14. A final, appealable order accompanies this Memorandum Opinion.

Dated: September 30, 2026

Amit P. Mehta
United States District Judge